Irvin S. TONGRET, Plaintiff,

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, Defendant.**

No. 1:96 CV 1714.

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 30, 1997.

---

William F. Schmitz, Eugene B. Meador, Kitchen, Deery & Barnhouse, Cleveland, OH, for Plaintiff.

Patrick J. Smith, Porter, Wright, Morris & Arthur, Columbus, OH, Ezio A. Listati, Porter, Wright, Morris & Arthur, Cleveland, OH, for Defendant.

## MEMORANDUM OPINION AND ORDER

NUGENT, District Judge.

This matter comes before the Court on Defendant's Motion For Summary Judgment pursuant to Federal Rule of Civil Procedure 56 (Docket # 20). For the reasons stated in the Memorandum Opinion issued with this Order, the Motion for Summary Judgement is hereby GRANTED.

## FACTUAL BACKGROUND

Plaintiff began his service as a trainman with NW in 1964. For most of Plaintiffs' career with NW, he worked in NW's Cleveland, Ohio yard. During his employment with NW, Plaintiff was a member of, and was represented by, The United Transportation Union, which had a collective bargaining agreement with NW. The seniority system governing NW's trainmen under the collective bargaining agreement allowed trainmen with greater seniority to "bump" (i.e.displace) those with lesser seniority.

In December 1992, Plaintiff was reassigned to work in NW's Toledo, Ohio yard where he worked until November 1995. Plaintiff was required to accept the Toledo reassignment in order to maintain his seniority. Plaintiff bumped a junior employee in Toledo to take a position in the Toledo yard.

Once in Toledo, Plaintiff received two telephone calls and numerous letters, all advising Plaintiff to leave town. Plaintiff informed his supervisors and his union of the threatening letters, which he estimates he received every three or four weeks, beginning soon after he started working in Toledo. Plaintiff also claims that some of his co-workers harassed him by asking him what he was doing in Toledo and by calling him "Stu–Baby," a nickname he disfavored. In 1994, Plaintiff claims to have discovered a dent and scratched paint on his car. He failed to report the incident to anyone at NW. Additionally, Plaintiff claims that his locker key, work key, and time slip were stolen from the locker room while he was not looking. Plaintiff reported this incident to Superintendent Steigal.

Plaintiff also claims that two of his supervisors, Messrs. Simmons and Rakotci, harassed him by getting in his face, breathing on his face, and calling him "Stu–Baby." Plaintiff also claims that on November 9, 1995, during a meeting in Mr. Simmons' office, Mr. Rakotci hit Plaintiff. According to Plaintiff, Mr. Rakotci walked into Mr. Simmons' office and sat down while Mr. Simmons and Plaintiff were discussing an error in Plaintiff's paycheck. Mr. Rakotci then got up, walked over to where Plaintiff was stand-

ing, hit Plaintiff in the back of the neck, put him in a headlock, and breathed in his face and said "Stu Baby, Stu Baby, Stu Baby." Deposition of Irvin S. Tongret ("Tongret Dep.") at 69–74. Plaintiffs head moved forward when Mr. Rakotci did this, but his hat did not fall off and Plaintiff remained standing. Plaintiff claims that the incident left him "mentally injured." Tongret Dep. at 74. Plaintiff did not have a bump on his head, but he says he did have a headache that night after work.

Immediately after this incident Plaintiff claims he went to Superintendent Fouts' office to report it, but Mr. Fouts was not in. Plaintiff took a few moments to collect himself after this incident and then proceeded with his work day. Plaintiff continued to work his normal shifts through November 21, 1995 without confrontation. After that date Plaintiff went on vacation. On November 30, Plaintiff went to see Dr. Patel, a psychiatrist, regarding the alleged harassment. Dr. Patel believed that Plaintiff was showing signs of depression, anxiety and paranoia. At the end of January, 1996, Dr. Patel admitted Plaintiff to Timken Mercy Medical Center for treatment. After Plaintiff's discharge on February 2, 1996, Plaintiff continued to take prescribed medication and to see Dr. Patel for treatment.

Plaintiff has not returned to work since November 21, 1995, as he is afraid the alleged threats and harassment would continue.

### STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it

believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting FED.R.CIV.P. 56(c)). A fact is material only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is genuine requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion "in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *see also U.S. v. Hodges X–Ray, Inc.*, 759 F.2d 557, 562 (6th Cir.1985).

Summary judgment should be granted if the party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir.1995) (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). Accordingly, "[t]he mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995) (citing *Anderson*, at 248–49, 106 S.Ct. at 2510–11). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510 (citations omitted).

Once the moving party has satisfied its burden of coming forward with evidence demonstrating an "absence of a genuine issue of material fact," *Celotex* 477 U.S. at 323, 106 S.Ct. at 2552 the burden then shifts to the nonmovant. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir.1995). Federal Rule of Civil Procedure 56(e) provides as follows:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon

the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

FED.R.CIV.P. 56(e). The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

Though the parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred that, " '[i]t is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.' " *Wiley v. U.S.,* 20 F.3d 222, 226 (6th Cir.1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.,* 854 F.2d 1179, 1181 (9th Cir.1988)). Rule 56(e) also has certain, more specific requirements:

> [it] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies of all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley,* 20 F.3d at 225–26 (citations omitted). However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect. The burden is on the opposing party to object to the improper evidence; failure to object constitutes a waiver. As the Sixth Circuit stated in *Wiley,*

> [i]f a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Court of Appeals] will review such objections only to avoid a gross miscarriage of justice.

*Id.* at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 248–49, 106 S.Ct. at 2510–11. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2510.

## DISCUSSION

Plaintiff filed this FELA action to recover for emotional distress he claims to have suffered as a result of the alleged negligence of NW. Specifically, Plaintiff alleges that he suffered emotional distress because "[NW] negligently supervised and condoned the abusive, unsafe and hostile conduct of management and employees who engaged in individual efforts or a conspiracy to embarrass, frustrate, humiliate, harass, torment, ridicule, assault and harm [him]." Plaintiff's First Amended Complaint ¶ 24.

Section 1 of FELA provides that "[e]very common carrier by railroad * * * shall be liable in damages to any person suffering injury while he is employed by such carrier * * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier[.]" 45 U.S.C. § 51. The Supreme Court of the United States has interpreted this section to permit recovery for negligent infliction of emotional distress. *See Consolidated Rail Corporation v. Gottshall,* 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994).

Such claims are not limitless, however. In *Gottshall,* the Supreme Court held that such claims must be evaluated under the "zone of danger" test, which, "[p]erhaps based on the realization that a near miss may be as frightening as a direct hit, * * * limits recovery for emotional injury to those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by

that conduct." 512 U.S. at 546, 114 S.Ct. at 2406 (internal quotation and citation omitted). In other words, "an emotional injury constitutes injury resulting from the employer's negligence for purposes of FELA only if it would be compensable under the terms of the zone of danger test." 512 U.S. at 554, 114 S.Ct. at 2410 (internal quotations and citation omitted). The Supreme Court determined that this test "harmonizes" "FELA's central focus on physical perils" and its textual reference "simply to 'injury.'" 512 U.S. at 554, 114 S.Ct. at 2410.

Because Plaintiff has demonstrated neither a physical impact nor an immediate threat of physical harm sufficient to place himself within the zone of danger, his emotional injuries, the authenticity of which the Court does not evaluate, are non-recoverable under FELA. Plaintiff points to Mr. Rakotci's headlock as the requisite physical impact. That headlock, however, while literally a physical impact, did not place Plaintiff within the zone of danger. In reality the headlock was nothing more than an uninvited touching, not an infliction of injury. Because FELA is concerned with threats to physical safety and security, mere unwanted touching cannot constitute the requisite physical impact under the zone of danger test. *See Gottshall,* 512 U.S. at 554, 114 S.Ct. at 2410 ("The zone of danger test also is consistent with FELA's central focus on physical perils."); *see also McMillan v. National Railroad Passenger Corp.,* 648 A.2d 428, 430, 433–34 (D.C.App.1994) (plaintiff not within zone of danger even though coworker that plaintiff displaced punched plaintiff in the arm; another coworker placed lit blowtorch under the seat of plaintiff's welding pants; and another coworker hit table on which plaintiff was working, causing table to bounce). This conclusion, moreover, is consistent with *Gottshall's* recognition that there has to be some limitation on the viability under FELA of emotional injury claims in order to prevent frivolous or fraudulent claims and unlimited liability. *Id.* at 555, 114 S.Ct. at 2411.

Nor can the Court conclude that Mr. Rakotci's actions created an immediate risk of harm. Though Plaintiff may have been shaken up by the incident, he managed to work his full shift the day the incident occurred, and completed his scheduled shifts during the subsequent eleven days. Plaintiff chose not to file a grievance over the incident and did not make any further efforts to inform the Superintendent of the incident.

Similarly, the harassment allegedly engaged in by Plaintiff's coworkers and supervisors did not place Plaintiff within the zone of danger. None of the alleged harassment created an imminent threat of physical harm. The letters and telephone calls did not threaten Plaintiff with harm, but rather only told Plaintiff to leave town. While he reported the letters to NW representatives, Plaintiff nevertheless continued to work, despite receiving an average of one such letter every three to four weeks. Nor can the claimed vandalism to Plaintiff's car be considered a threat of imminent physical harm, as Plaintiff was not in the car when it happened, does not know who caused it, and did not see fit to report the incident. And, the claimed theft of his keys and time card, while surely irritating, even if true did not create a threat of imminent physical harm. In short, none of these incidents of alleged harassment constitute a "near miss" of physical injury, and thus do not permit recovery for emotional distress.

Plaintiff erroneously likens the instant case to *Vance v. Consolidated Rail Corp.,* 73 Ohio St.3d 222, 652 N.E.2d 776 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 776, 133 L.Ed.2d 728 (1996), in which the Supreme Court of Ohio held that harassment inflicted upon a railroad employee placed him within the zone of danger. Unlike Plaintiff here, the employee in *Vance* was not given "important safety devices," and was physically threatened by co-workers on at least two occasions, once with a moving vehicle and once with a chipping hammer. *Id.* at 230, 652 N.E.2d 776. The employee in *Vance* also found a dead rat in his lunch box and sugar in the gas tank of his wife's car after it was parked in the railyard. The phrase "Erie scab" was scraped into the side of the employee's truck. *Id.* at 224, 652 N.E.2d 776. The employee also received an anonymous telephone call telling him that "you won't

know what's going to hit you." *Id.* The alleged harassment in the instant case does not approach the seriousness of the harassment in *Vance.* For example, the notes Plaintiff received advised him to leave town, but did not threaten physical consequences, as did the telephone call in *Vance.* Moreover, Plaintiff was not deprived of necessary safety equipment and was not repeatedly threatened physically. In short, the alleged harassment in the instant case did not create an imminent threat of physical harm.

Plaintiff claims that he did in fact fear for his safety during the harassment. Specifically, Plaintiff alleges that the harassment left him angry and unable to concentrate, causing him to fear that he would get "wrapped up" in the moving trains. Tongret Dep. at 90–91; *see also id.* at 74, 80, 82. But this fear of harm, even if genuine, was the result of *Plaintiff's alleged emotional distress, not the conduct of Plaintiff's co-workers or supervisors.* For emotional injuries to be compensable, they must be *caused by an imminent threat of physical harm* resulting from the defendant's negligent conduct. As the Supreme Court ruled in *Gottshall,* "[u]nder th[e] [zone of danger] test, a worker within the zone of danger of physical impact will be able to recover for emotional injury *caused by fear of physical injury to himself* [.]" *Gottshall,* 512 U.S. at 554–55, 114 S.Ct. at 2410–11 (emphasis added); *see id.* at 556, 114 S.Ct. at 2411 ("Railroad employees thus will be able to recover for injuries—physical and emotional—*caused by the negligent conduct of their employers that threatens them imminently with physical impact.*") (emphasis added). In the instant case, by contrast, Plaintiff's fear of getting hurt was caused by his claimed emotional injuries, and not the other way around.

For the foregoing reasons, NW's Motion for Summary Judgment is hereby **GRANTED.**

IT IS SO ORDERED.